IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : CRIMINAL NO. 25-94-1 |
| vs. | : |
| AMRIDDIN ABDUMALIKZODA | : HON. WENDY BEETLESTONE |

**SENTENCING MEMORANDUM OF
DEFNEDANT AMRIDDIN ABDUMALIKZODA**

## I. INTRODUCTION

Defendant Amriddin Abdumalikzoda appears before the Court having pled guilty to serious offenses involving bringing aliens into the country for financial gain. Mr. Abdumalikzoda accepts full responsibility for his conduct and does not seek in any way to diminish the seriousness of his offenses. At the same time, 18 U.S.C. §3553(a) requires the Court to impose a sentence that is individualized and proportionate; that is, "sufficient, but not greater than necessary."

For the reasons set forth below, Mr. Abdumalikzoda requests this Court vary below the applicable guideline sentencing range and sentence him to time served.

## II. PROCEDURAL BACKGROUND

On October 2, 2025, Mr. Abdumalikzoda pleaded guilty to Counts One and Two of a Superseding Indictment charging him with conspiracy to bring aliens into the United States for private financial gain, in violation of 8 U.S.C. §1324(a)(1)(A)(v)(I) and attempt to bring an alien into the United States for private financial gain, in violation of 8 U.S.C. §1324(a)(2)(B)(ii).

Mr. Abdumalikzoda was arrested for immigration violations on March 3, 2025 and subsequently taken into federal custody for the instant offenses on March 14, 2025 and has

been in federal custody ever since. At the time of sentencing, Mr. Abdumalikzoda will have been in federal custody for approximately eleven months. Revised Pre-Sentence Report ("PSR") p. 2.

### III. PRESENTENCE REPORT GUIDELINE CALCULATION AND OBJECTIONS THERETO

The PSR provides that Mr. Abdumalikzoda's guideline range is calculated as follows: Counts One and Two are grouped for guideline calculation purposes. See PSR ¶26-27. The base offense level is 12, pursuant to USSG § 2L1.1(a)(3). PSR¶27. The offense level is then increased by six levels because the offense involved the smuggling of between 25 and 99 aliens, pursuant to USSG §2L1.1(b)(2)(B). PSR ¶28. An additional two-level enhancement applies because the offense conduct created a substantial risk of death or serious bodily injury, based on the facilitation of a perilous journey through treacherous terrain in areas not designated for lawful entry, pursuant to USSG §2L1.1(b)(6). PSR ¶29. These adjustments result in an adjusted offense level of 20. PSR ¶31. Mr. Abdumalikzoda then receives a three-level reduction for timely acceptance of responsibility under USSG § 3E1.1(a) and (b), and another two-level reduction because he meets the criteria for Zero-Point Offender, pursuant to USSG §4C1.1. PSR ¶¶ 34–36. Accordingly, the total offense level is 15. PSR ¶ 37. Mr. Abdumalikzoda has zero criminal history points and is therefore in Criminal History Category I. PSR ¶¶ 40.

Based on a total offense level of 15 and Criminal History Category I, the advisory guideline range is 18 to 24 months.

Mr. Abdumalikzoda does not dispute the guideline calculation as set forth in the revised Presentence Report. As the Supreme Court and the 2025 Sentencing Guidelines make clear, however, the advisory guideline calculation is only the first step in the

sentencing analysis. The Court must next consider the factors set forth in 18 U.S.C. §3553(a) to determine a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing and to impose an individualized and just sentence in this case.

IV.  THE NEW TWO-STEP SENTENCING PROCESS UNDER THE 2025 GUIDELINES MANUAL

On November 1, 2025, the United States Sentencing Commission implemented a major structural revision to the Guidelines Manual, expressly reorganizing it to reflect what the Supreme Court has required since *United States v. Booker*, 543 U.S. 220 (2005): that federal sentencing consists of two analytically distinct steps, and that the Guidelines are only the first step in a broader inquiry governed by 18 U.S.C. §3553(a). The Commission's new Introductory Commentary makes clear that the 2025 Guidelines Manual is designed not as a prescriptive sentencing code but as a framework subject to the primacy of the statutory "parsimony principle"—a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing. See USSG, Ch.1, Pt. A. intro. comment.

The Introduction states: "The Guidelines Manual is structured to reflect the advisory sentencing scheme established following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), recognizing both essential steps of the court's inquiry in imposing a sentence 'sufficient, but not greater than necessary.'… The guidelines and policy statements… represent the first step in the sentencing process and are one of multiple factors judges must consider under 18 U.S.C. §3553(a)." USSG, Ch.1, Pt. A. intro. comment.

This structural revision is not merely cosmetic. It codifies nearly two decades of Supreme Court jurisprudence emphasizing that the Guidelines, while still the "starting

3

point," no longer predominate in the selection of the appropriate sentence. The revised Manual thus reinforces that sentencing courts are obligated to perform two separate tasks:

### A. Step One: Properly Calculate the Advisory Guideline Range

The first step is unchanged: the district court must begin by correctly calculating the advisory guideline range. *Booker* held that this calculation remains a mandatory component of sentencing procedure, even though the Guidelines themselves are not binding. *Booker*, 543 U.S. at 264. As the Background to §1B1.1 explains: "District courts are first required to properly calculate and consider the guidelines when sentencing.… 'The district courts, while not bound to apply the Guidelines, must… take them into account when sentencing.'" USSG §1B1.1, comment. (backg'd), citing *Booker*, 543 U.S. at 264.

The Supreme Court has repeatedly reaffirmed this requirement:

- *Gall v. United States,* 552 U.S. 38, 49 (2007*)*(citing *Rita v. United States*, 551 U.S. 338, 347-348(2007):"a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.")
- *Gall v. United States*, 552 U.S. 38, 49 (2007): "[t]he Guidelines are the "starting point and initial benchmark."
- *Peugh v. United States*, 569 U.S. 530, 541–42 (2013): "the federal system adopts procedural measures intended to make the Guidelines the 'lodestone' of sentencing."

The 2025 Manual continues to require that the court calculate the Base Offense Level, apply any Chapter Two and Three adjustments, determine the criminal-history score, apply any statutory constraints, and determine the final advisory range. See USSG §1B1.1(a). But, the calculation of the advisory range is not the end of the sentencing inquiry.

### B. Step Two: Independently Apply § 3553(a) to Determine the Sentence That Is "Sufficient, but Not Greater Than Necessary"

4

Once the advisory range is calculated, the court must then proceed to the second, statutorily mandated step: the application of the § 3553(a) factors to determine the sentence that satisfies the parsimony principle. As §1B1.1's Background now states:

"District courts are then required to fully and carefully consider the additional factors set forth in 18 U.S.C. § 3553(a)… Step two… reflects this step of the sentencing process." These factors direct the court to impose a sentence that is no greater than necessary to serve the recognized purposes of sentencing:

1. the nature and circumstances of the offense;
2. the history and characteristics of the defendant;
3. the need for the sentence to meet the purposes of sentencing in § 3553(a)(2);
4. the kinds of sentences available;
5. the need to avoid unwarranted disparities; and
6. restitution.

USSG §1B1.1 comment. (backg'd); see also *Rita*, 551 U.S. at 351; 18 U.S.C. §3553(a).

In exercising its sentencing discretion, the court is ultimately guided by the statutory factors, rather than being bound by the Guidelines. The Guidelines are "one factor among several." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).

The 2025 revisions formalize this by placing the Guideline calculation in Step One and the §3553(a) analysis in Step Two, reinforcing what has long been true: the correct sentence is the one that is individualized, holistic, and not driven mechanically by the Guidelines grid.

### C. The Elimination of Departures and the Reaffirmation of Individualized Sentencing

One of the most significant 2025 changes is the removal of all "departure" provisions from Chapters Four and Five, except §5K1.1 departures. Historically, the

5

Guidelines included dozens of "departure" mechanisms that allowed a court to impose a sentence outside the guideline range before turning to §3553(a). But after *Booker*, courts largely abandoned departures in favor of "variances," which arise from the §3553(a) analysis itself.

The Commission explained: "[i]n 2025, the Commission amended the Guidelines Manual to remove departures… to better align the requirements placed on the court and acknowledge the growing shift away from the use of departures… The Commission envisioned and framed this 2025 amendment to be outcome neutral, intending judges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside the applicable guideline range as a variance under 18 U.S.C. §3553(a)."  USSG, Ch.1, Pt. A. intro. comment.

"The removal of departures… does not limit the information courts may consider in imposing a sentence nor does it reflect a view… that such facts should no longer inform a court." *Id.* The Commission is explicitly acknowledging that:

- all formerly departure-eligible circumstances remain fully cognizable under §3553(a);
- the sentencing court may consider any relevant, reliable information, including information about the defendant's health, family responsibilities, substance-abuse history, trauma, lack of criminal history, aberrant conduct, and other individualized factors—even if they were previously "discouraged" or "not ordinarily relevant";
- the decision whether and how to vary from the advisory range lies squarely within the district court's discretion, guided by §3553(a)'s statutory command, not by any "departure" rubric.

See 18 U.S.C. §3553(a) (setting forth the statutory framework requiring an individualized sentence that is "sufficient, but not greater than necessary"), 18 U.S.C. §3661 ("[n]o limitation shall be placed on the information" a court may consider at

sentencing); *United States v. Booker*, 543 U.S. 220, 245–46 (2005) (holding Guidelines advisory and restoring full judicial discretion to consider all §3553(a) factors when selecting a sentence); *Gall v. United States*, 552 U.S. 38, 49–50, 57 (2007) (the Guidelines are the "starting point," but district courts must tailor a sentence to the defendant; variances may rest on individualized factors and need not be tied to Guideline departures); *Rita v. United States*, 551 U.S. 338, 351 (2007) (sentencing courts must begin with the correct Guideline range but then conduct an independent, individualized assessment under §3553(a)); *Kimbrough v. United States*, 552 U.S. 85, 109–10 (2007) (courts may vary based on policy disagreements with the Guidelines as well as individualized factors; the Guidelines do not bind the court's discretion); *Pepper v. United States*, 562 U.S. 476, 489–91 (2011) (sentencing judges may consider the "widest possible breadth of information" about the defendant, including personal history, rehabilitation, trauma, and other individualized factors; §3661 bars limitations on information considered at sentencing); *Nelson v. United States*, 555 U.S. 350, 351 (2009) (the Guideline range cannot be presumed reasonable; courts must make an independent determination under §3553(a)); *Peugh v. United States*, 569 U.S. 530, 541–42 (2013) (even in the advisory regime, the Guidelines remain only the "lodestone" and starting point; ultimate sentence must be justified by § 3553(a)); USSG, Ch.1, Pt. A. intro. comment. (eliminating departures; explaining that the amendment is "outcome neutral"; and expressly stating that facts formerly supporting departures remain fully available to courts as variances under §3553(a), and that removal of departures "does not limit the information courts may consider").

By placing all mitigation analysis under §3553(a), the 2025 Manual restores sentencing to what Congress intended in the Sentencing Reform Act: an individualized process in which judges weigh all relevant facts to reach a fair and just sentence.

### D. The Guidelines Inform; §3553(a) Decides

The result of these reforms is a sentencing structure that is more transparent, more coherent, and more aligned with controlling Supreme Court authority. The Guidelines calculation remains important, indeed, required, but its role is only one part of a broader, individualized analysis.

The Commission emphasizes that sentencing courts remain free to consider the full universe of mitigating information, noting that the 2025 amendments "do[es] not limit" what courts may consider. *Id.* This reinforces that the Guideline range acts as a reference point; §3553(a) governs the ultimate sentence; and individualized justice, not grid-driven uniformity, is the touchstone of the post-Booker sentencing system.

In short, the 2025 Guidelines Manual reflects a sentencing system that is consistent with what the Supreme Court envisioned: a system in which the court uses the Guidelines as a starting point, but where the final sentence is driven by human facts, individual circumstances, and the statutory parsimony principle.

### V.  APPLICATION OF THE § 3553(a) FACTORS TO AMRIDDIN ABDUMALIKZODA

With the 2025 Guidelines amendments eliminating departures and reaffirming the central role of individualized sentencing under § 3553(a), the Court's task is to determine how the statutory factors apply to the person before it.

Title 18 of the United States Code at Section 3553(a)(2), directs a court to impose a sentence "sufficient, but not greater than necessary" while contemplating the need for the

8

sentence to reflect the seriousness of the offense, promote respect for the law and provide just punishment; to afford adequate deterrence from criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care or other needed treatment.

To fashion a sentence that will adequately punish, deter and rehabilitate the offender, Section 3353(a) directs a court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the need to avoid unwarranted sentencing disparities, along with the types of sentences available, among other factors. 18 U.S.C. §3553(a).

The analysis below applies those factors to Mr. Abdumalikzoda's unique background.

### A. Nature and Circumstances of the Offense

Mr. Abdumalikzoda does not minimize the seriousness of the offense conduct. The crimes of conviction involve the unlawful smuggling of non-citizens into the United States for financial gain, conduct that strikes at the integrity of the country's immigration system at a time when immigration issues are subject to heightened public and governmental scrutiny. Moreover, the manner in which the offense was carried out exposed the individuals being smuggled to potential danger, as the routes utilized were not designated ports of entry and, in some instances, involved travel that carried an inherent risk to life and safety. Mr. Abdumalikzoda fully acknowledges his participation in this conduct and has accepted responsibility for his actions. At the same time, it is significant that Mr. Abdumalikzoda was not an organizer, leader, manager, or supervisor of the conspiracy.

### B. History and Characteristics of Amriddin Abdumalikzoda

Mr. Abdumalikzoda is 33 years old and was born in Hisar, Tajikistan. He was raised in a stable, intact family; his parents have been married for approximately 34 years. His mother is a pediatrician, and his father works in construction. He is one of four siblings, all of whom are educated and closely connected to one another. One sister is a child psychologist, another is a stay-at-home mother, and his brother is currently attending law school in Moscow. Prior to leaving Tajikistan, Mr. Abdumalikzoda maintained close and supportive relationships with both parents and his siblings. PSR¶46, 47.

Mr. Abdumalikzoda describes a healthy, loving upbringing in a well-established neighborhood where most residents were Muslim and well-educated. His paternal grandmother lived with the family, and his paternal grandparents resided nearby, reinforcing a strong multigenerational support structure. He reports no history of abuse, neglect, mistreatment, substance abuse or mental health treatment. PSR¶48.

Mr. Abdumalikzoda is married and is the father of two young daughters, ages eight and three. His wife is a stay-at-home mother who resides with their children. Notably, Mr. Abdumalikzoda's younger daughter was born just days before he fled Tajikistan, and he has never met her in person. He remains emotionally supported by his parents, siblings, friends, wife, and children, all of whom he reports missing deeply. PSR¶49.

Mr. Abdumalikzoda completed mandatory military service in the Tajikistan Army, including training at the military academy, and possesses official military identification reflecting his status as an officer. PSR¶58. He also earned a university degree in economics and computer studies after five years of study at the University of Tajikistan, where he was an average student and participated in recreational sports such as soccer and volleyball. PSR¶57.

For approximately ten years, Mr. Abdumalikzoda owned and operated a successful HVAC business, called Energy Service, in Dushanbe, Tajikistan. The business employed approximately 42 workers and provided steady income for his family. During this period, Mr. Abdumalikzoda earned the equivalent of approximately $10,000 monthly in U.S. currency, reflecting a stable, lawful livelihood. The business was successful until it became involved in a serious contract dispute with the nephew of the president of Tajikistan, also allegedly connected to the mafia.  PSR¶50.

Due to language barriers, Mr. Abdumalikzoda has difficulty articulating the precise legal and financial contours of that dispute. He reports, however, that he believes a substantial amount of money was owed to him and that, as the conflict escalated, he feared powerful individuals associated with the dispute could use political influence to subject him to criminal prosecution or detention. *Id.* Mr. Abdumlikzoda reports that law enforcement, the courts and politicians in Tajikistan are corrupt. Whether or not those fears were objectively justified, they provide important context for his decision to flee Tajikistan while his family remained behind. They do not excuse his conduct in this case, but they help explain the circumstances under which he left his country and the conduct that followed.

On December 18, 2022, Mr. Abdumalikzoda was arrested while attempting to enter the United States illegally by crossing the Mexico-U.S. border in Arizona. He was detained for approximately five days, after which he was released and traveled to Brooklyn, initially residing with a friend. When that arrangement became untenable, he relocated to Philadelphia, where he lived with four friends in a rented row home in Northeast

Philadelphia for approximately 17 months, until his arrest by ICE on March 3, 2025. PSR¶50-51.

According to information reflected in FBI reports, Mr. Abdumalikzoda has applied for asylum in the United States and currently has a preliminary hearing scheduled for November 12, 2027. PSR¶61, ftnt. 12. Mr. Abdumalikzoda recognizes that the merits of that application are not before this Court and will be addressed in the appropriate immigration forum. Nevertheless, the pendency of those proceedings is relevant to understanding his present circumstances, including the prolonged uncertainty surrounding his legal status, continued separation from his family, and the significant collateral consequences he already faces independent of any sentence imposed here.

Mr. Abdumalikzoda is in good physical health. He has no history of alcohol or drug use. He reports no mental or emotional health issues, apart from the significant stress associated with the events surrounding his departure from Tajikistan. During that period, he acknowledges that he contemplated suicide. That he contemplated suicide, which is prohibited by his faith, underscores the gravity of the pressure he perceived at the time. He is a devout Muslim, and his religious beliefs continue to play a central role in his life. PSR¶53-56.

While detained at the Federal Detention Center, Mr. Abdumalikzoda occupies his time by exercising regularly, reading, watching television, and praying daily. He has no institutional infractions. Due to language barriers and housing separation, he has been unable to obtain work while detained. He speaks only limited English, and his incarceration has been particularly challenging because of difficulty communicating with staff and other inmates, though his English skills are gradually improving.

Given the geographic distance and Mr. Abdumalikzoda's current custodial status, contact with family members for the purpose of providing support to the Court prior to sentencing has not been possible. Nevertheless, based on Mr. Abdumalikzoda's consistent reporting and the longstanding relationships he describes, there is little doubt that, if contacted, his family members and close friends would speak highly of him as a devoted husband and father, a reliable provider, and a man who supported his family through years of lawful and successful business endeavors. The absence of formal letters or in-person statements should therefore not be understood as a lack of familial support, but rather as a function of distance and circumstance beyond Mr. Abdumalikzoda's control.

In total, Mr. Abdumalikzoda's background reflects a person who lived a productive, law-abiding life for many years; who maintained strong family ties, employment, and community responsibilities; and who now faces profound personal, familial, and immigration-related consequences.

### C. The Need for the Sentence to Promote Respect for the Law, Provide Just Punishment, and Adequate Deterrence

A sentence of time served in this case would adequately promote respect for the law, provide just punishment, and afford both specific and general deterrence. Over the past approximately eleven months, Mr. Abdumalikzoda has experienced substantial punishment through his incarceration in a federal detention facility far from his family, in a setting where language barriers severely limit his ability to communicate with staff and other inmates. That isolation, combined with the uncertainty of his immigration status and separation from his wife and young children, has already had a profound punitive effect. There is no reason to believe that Mr. Abdumalikzoda, who has no prior criminal history

and has accepted responsibility for his conduct, will reoffend; the experience of detention alone has been sufficient to deter him from any future criminal conduct.

Moreover, a sentence of time served is not a nominal sanction. It reflects a significant period of custodial incarceration and sends a clear message that offenses involving the unlawful smuggling of non-citizens are treated seriously by the federal courts. Such a sentence would meaningfully deter others who might contemplate similar conduct, while avoiding a punishment greater than necessary to achieve the goals of sentencing. Under these circumstances, a time-served sentence appropriately balances the seriousness of the offense with the individualized assessment required by 18 U.S.C. § 3553(a).

### D. The Need to Protect the Public

The need to protect the public does not warrant a lengthy term of imprisonment in this case. Mr. Abdumalikzoda has no prior history of criminal activity whatsoever before the instant offense, and the conduct of conviction did not involve violence, weapons, or threats of harm to any individual. While the offense conduct undeniably carried risk to the non-citizens involved, it was not driven by violent intent, nor did it reflect a propensity for harm to others. There is no basis to conclude that Mr. Abdumalikzoda poses a danger to the community, and nothing in his history suggests a likelihood of future criminal behavior. Moreover, given Mr. Abdumalikzoda's immigration status and the likelihood of continued custody or removal proceedings following sentencing, the prospect of release into the community is limited. Even if released, there is no reason to believe he would pose any risk to public safety. Under these circumstances, further incarceration is not necessary to protect the public.

### E. Avoiding Unwarranted Sentencing Disparities

A sentence of time served would also satisfy the directive to avoid unwarranted sentencing disparities among similarly situated defendants. When Mr. Abdumalikzoda's lack of criminal history, acceptance of responsibility, non-leadership role, and extraordinary collateral consequences are considered, including the near certainty of immigration detention and removal following completion of his sentence, a downward variance to time served would not result in a sentence meaningfully disparate from those imposed on comparable defendant. Rather, it would reflect a sentence tailored to Mr. Abdumalikzoda's particular circumstances and the realities he faces beyond this Court's judgment.

### F. The Need for Education, Vocational Training, and Medical Care

With respect to the need to provide Mr. Abdumalikzoda with educational or vocational training, medical care, or other correctional treatment, this case presents no specific issues requiring extended incarceration to achieve those goals. Mr. Abdumalikzoda is in good physical and mental health, has no history of substance abuse, and does not require specialized treatment or programming. Moreover, given the near certainty of immigration detention and removal following the completion of his sentence, additional time in Bureau of Prisons custody would not meaningfully advance rehabilitative objectives. Accordingly, this factor does not weigh in favor of a longer term of imprisonment.

Case 2:25-cr-00094-WB   Document 31   Filed 02/11/26   Page 16 of 17

## VI. CONCLUSION

Considering the advisory Sentencing Guidelines and all of the factors set forth in 18 U.S.C. § 3553(a), a sentence of time served would adequately serve the purposes of sentencing and would be sufficient, but not greater than necessary, to comply with the statutory goals of punishment, deterrence, protection of the public, and rehabilitation. For the reasons set forth above, Defendant Amriddin Abdumalikzoda respectfully requests that the Court impose a sentence of time served.

**Respectfully submitted**

*Margaret M. Grasso*

***MARGARET M. GRASSO, ESQUIRE***
*Law Office of Margaret M. Grasso*

**Attorney for Amriddin Abdumalikzoda**

February 11, 2026

## **CERTIFICATE OF SERVICE**

      I, Margaret M. Grasso, Esquire, certify that I have delivered a copy of the foregoing Sentencing Memorandum to Assistant United States Attorney Everett Witherell via electronic mail.

                    **LAW OFFICE OF MARGARET M. GRASSO**

                    */s/ Margaret M. Grasso*
                    **MARGARET M. GRASSO, ESQUIRE**
                    **Attorney for Amriddin Abdumalikzoda**

February 11, 2026